**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ANDREA LEAH HECKEL,

     Plaintiff,

     vs.                                       Civ. No. 18-649 KK

ANDREW SAUL, Commissioner
of the Social Security Administration,[1]

     Defendant.

## MEMORANDUM OPINION AND ORDER[2]

THIS MATTER is before the Court on Plaintiff Andrea Leah Heckel's ("Ms. Heckel") Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 23) ("Motion"), filed January 23, 2019, seeking review of the partially favorable decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), on Ms. Heckel's claim for Title II disability insurance benefits and Title XVI supplemental security income benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner filed a response in opposition to the Motion on March 3, 2019, (Doc. 25), and Ms. Heckel filed a reply in support of the Motion on April 8, 2019.  (Doc. 26.)  Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised in the premises, the Court FINDS that Ms. Heckel's Motion is well taken and should be GRANTED.

## I.  Procedural History and Background

### A.  Procedural History

---

[1] Andrew Saul was confirmed as the Commissioner of Social Security on June 4, 2019 and is automatically substituted as a party under Federal Rule of Civil Procedure 25(d) and 42 U.S.C. § 405(g).

[2] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case.  (Doc. 9.)

This is the third appeal in this case. (*See* AR 485-507, 1232-43.) Ms. Heckel protectively filed applications for disability insurance benefits and supplemental security income benefits on July 16, 2010, alleging a disability onset date of November 4, 2009. 42 U.S.C. §§ 401 *et seq.*; 42 U.S.C. §§ 1381 *et seq.* (AR 57, 58.) The agency denied Ms. Heckel's applications at the initial level and upon reconsideration on January 5, 2011 and May 19, 2011, respectively. (AR 62, 72.) The first hearing before an Administrative Law Judge (ALJ) in this case took place on March 20, 2012. (AR 23-56.) ALJ Michelle K. Lindsay issued her unfavorable decision on June 1, 2012. (AR 8-10.) Upon Ms. Heckel's appeal, this Court reversed the Commissioner's decision and remanded Ms. Heckel's case based on ALJ Lindsay's failure to assign weight to, or address all of the limitations noted in, the opinion of Shari Spies, Psy.D., a consulting psychologist. (AR 485-507.)

A second hearing, this time before ALJ Ann Farris, took place on January 6, 2015. (AR 414-50.) Ms. Heckel, her treating psychotherapist, Madeleine Brady, MA, LMHC, and vocational expert (VE) Diane Weber testified. (AR 414-50, 648.) ALJ Farris issued her unfavorable decision on March 6, 2015, (AR 384-405) from which Ms. Heckel appealed. *See Heckel v. Social Security Administration*, No. 15-cv-453-LF, Doc. 1. This Court again reversed the Commissioner's decision and remanded Ms. Heckel's case after concluding that ALJ Farris failed to either incorporate, or explain why she rejected, functional limitations noted in the medical reports of Carol Capitano, Ph.D., CNS, one of Ms. Heckel's treating providers, and State agency psychological consultant Donald Gucker, Ph.D.[3] (AR 1323-43.) On October 29, 2015, while Ms. Heckel's second appeal was pending in this Court, Ms. Heckel filed subsequent claims for

---

[3] Ms. Heckel made other arguments in her second appeal, including that the ALJ had failed to properly consider opinion evidence from her treating psychotherapist, Madeleine Brady, that were not addressed in the Court's Memorandum Order and Opinion based on the Court's determination that the other alleged errors may be affected by the ALJ's treatment of the case on remand. (AR 1328-29.)

disability insurance benefits and supplemental security income. (AR 1346.) On remand, the Appeals Council instructed the ALJ to consolidate Ms. Heckel's applications, create a single record, offer Ms. Heckel another administrative hearing, take any further action to complete the administrative record, and issue a new decision. (*Id.*)

Pursuant to the Appeals Council's instructions, ALJ Farris conducted another administrative hearing on February 6, 2018 at which Ms. Heckel and vocational expert (VE) Cindy A. Harris testified. (AR 1261-92.) On March 13, 2018, ALJ Farris issued a partially favorable decision in which she found that Ms. Heckel was not disabled as of December 31, 2014, Ms. Heckel's date of last insured, but that Ms. Heckel became disabled on June 1, 2015 and was, therefore, entitled to supplemental security income. (AR 1223-46.) This appeal followed. (Doc. 1.)

## B. Ms. Heckel's Background

### 1. Childhood and Family History

Ms. Heckel is a forty-two-year-old woman described by one clinical psychologist as having experienced depression since childhood. (AR 2234.) She was first hospitalized as an adolescent after attacking her sister with homicidal rage (AR 1121) and has been hospitalized numerous other times in her life for various reasons, including depression, anger, attempting suicide, and having suicidal ideations.[4] (AR 172, 174, 175, 176, 465, 1120-22, 1679, 2232.) A self-described army brat (AR 1120), Ms. Heckel has been estranged from her family since 2007, which she attributes to her relationship with her father, whom she describes as having been "an exceptionally abusive man[,]" physically and verbally.[5] (AR 434-35, 1275-76.)

---

[4] Ms. Heckel's history of hospitalizations is discussed in greater detail in Section II.B.4 *infra*.

[5] For example, Ms. Heckel alleges that her father broke her nose a number of times. (AR 1283.)

### 2. Education and Work History

Ms. Heckel graduated from high school in 1995 and attended college for one year before being asked to leave for doing "some very inappropriate things[.]" (AR 455, 461.) She worked in various accounting and other administrative positions for approximately thirteen years until November 3, 2009 when she was fired from her job as an assistant comptroller. (AR 420, 457-59, 1267.) The longest Ms. Heckel held a job was just under three years, though at some points she reported not being able to hold a job for more than a few months. (AR 423-24.) According to Ms. Heckel, she was fired from her last job because her "personality issues got to be too much for them to handle and they didn't want me in the office anymore." (AR 458.) Specifically, Ms. Heckel reported that on occasion, she would throw things, such as her paperwork or headset. (AR 459.) On days when she did not feel like going to work but went anyway to avoid being fired, she would hole herself up in her office and be "very abrupt" or "argumentative" with coworkers and customers. (AR 459.) Ms. Heckel acted that way because "I didn't want to be around people. I really wanted to be back at my house in a closed space where nobody was around." (AR 459.)

### 3. Social History

Ms. Heckel is not married, has no children, and had not had a "significant relationship" in more than ten years as of February 2018. (AR 1286, 1680.) She was briefly incarcerated in January 2009 following a domestic dispute with her then-girlfriend and was again incarcerated in March 2010 after assaulting her girlfriend (AR 270, 289, 299.) She lives with her cats and her service dog, Mijo, who accompanies her at all times. (AR 1005, 1279-80, 2235.) At times, she has lived with a roommate (AR 455), but she typically does not live with other people because she has difficulty getting along with them. (AR 297.) Ms. Heckel has been evicted from her housing on at least two occasions due to nonpayment of rent. (AR 1146.) For a brief period in early 2014, she

was living in a storage unit after being evicted. (AR 1002, 1005.) She has lived on her own since 2014, first in an extended-stay unit paid for by the Church of Jesus Christ of Latter-Day Saints, and starting in December 2015 in her own house. (AR 426, 913-14, 985, 1271-72, 1675.) Since July 2016, she has received assistance from a home healthcare worker for approximately four hours per day, Monday through Friday, with grocery shopping, food preparation, cooking, cleaning, and hygiene routines.[6] (AR 1271-72, 1973.)

Ms. Heckel avoids leaving the house unless she absolutely must and tries to limit essential shopping (i.e., groceries and pet supplies) to no more than two outings per month. (AR 199-206, 211, 460-62.) At times, she has used marijuana to help reduce her anxiety so that she could "at least go and function for a short period of time in a public setting and then be able to come back without being a complete spastic mess in public." (AR 474.) Ms. Heckel stopped using marijuana recreationally in February 2014 but began using medicinal cannabis in 2016 to help control her posttraumatic stress disorder (PTSD). (AR 424, 1270.) While capable of driving, she prefers not to drive because it triggers anxiety. (AR 426.) She reported to her therapist in May 2017 that she was driving a lot at that time while housesitting two different properties but that she was "not liking it." (AR 2058.)

Ms. Heckel's daily activities consist of reading, playing with her pets, watching television, and crafting, though her ability to craft has been restricted by progression of her carpel tunnel syndrome. (AR 203, 430, 468-69, 1273, 1276-77.) For a period of time, Ms. Heckel experienced hypersomnia, taking long naps in the afternoon, which she attributed to medications she was taking. (AR 1277, 1983, 1990, 1992.)  While Ms. Heckel reportedly visited with friends on a

---

[6] Ms. Heckel is considered morbidly obese. She gained over thirty pounds in a six-month period in 2014 and reportedly gained 70-80 pounds in the one-year period mid-2014 to mid-2015. (AR 993, 1693, 1691, 2233.) At her February 2018 administrative hearing, Ms. Heckel, who is about 5'5"-5'6" tall, reported weighing 359 pounds. (AR 1269.)

regular basis as of April 2013, she testified at the February 2018 administrative hearing that most of her friends had "kind of fallen away" because she had been unable to participate in activities and go to functions. (AR 781, 1275.)

Ms. Heckel regularly attends church; however, when attendance is high, she does not attend because she "can't be in a crowd that big." (AR 1273, 1286.) She described herself as being able to get along with people at the church "[f]or the most part" (AR 1275) and indicated that she enjoys participating in church functions, though she described social gatherings at church as being "too intense" for her. (AR 1273, 1275.)

### 4.    Mental Health, Hospitalization, and Therapeutic Treatment History

The record contains no medical records regarding Ms. Heckel's treatment history prior to 2009. However, in completing her disability report in 2010, Ms. Heckel reported that she received treatment from various providers while living in Arizona, comprising: (1) a 2-3-week hospitalization in 1991 at Ramsey Canyon Hospital and Treatment where she was treated for "emotional issues, depression, suicide attempt, homicide attempt, anxiety disorder, family issues/abuse issues" (AR 175); (2) a 2-3-week hospitalization in 1992 at Tucson Psychiatric Institute for "homicide attempt, coping issues, emotional issues, suicide attempt, depression" (AR 176); (3) hospitalization at the Desert Hills Center for Youth & Family from 1992-1993 for "depression, anxiety disorder, Borderline personality, suicide/homicide attempts, coping issues" (AR 174); (4) treatment, including medication management, with Dr. Danielle Freberg at Mission Family Medical from 2001-2005 for various mental and physical health issues (AR 172); (5) a one-week hospitalization in 2004-2005 at St. Luke's Behavioral Health Hospital on referral of Dr. Freberg for "suicide attempt, issues with cutting/self[-]mutilation, dissociative disorder, anxiety, B[orderline] P[ersonality] D[isorder], PTSD" (AR 172, 175); and (6) follow-up care ("[t]alk

therapy") at Catalina Behavioral Health following her inpatient stay at St. Luke's from January-February 2005. (AR 173) Ms. Heckel additionally reported taking the following medications, prescribed by various of the aforementioned providers: Abilify (mood stabilizer), Depakote, Geodon, and Seroquel (antipsychotics), Tegretol (antidepressant), and various other unspecified antidepressants and sleeping medications. (AR 171.)

The earliest relevant medical record contained in the administrative record before the Court is from January 2009.[7] The administrative record reflects that over the next nine years, Ms. Heckel was evaluated and/or treated by no fewer than fifteen providers.[8] Ms. Heckel's treatment history as documented in medical records from 2009-2017 is chronicled below.

**2009**

While incarcerated at the Bernalillo County Metropolitan Detention Center (MDC) in January 2009, Ms. Heckel underwent a psychological evaluation in which it was noted that she had a history of manic-depressive disorder, anxiety disorder not otherwise specified, and borderline personality disorder. (AR 280-81.) She was deemed to be not seriously mentally ill and was not prescribed any medications because she was being released that same day and expressed that she did not want any medication. (AR 281.)

Shortly after being released, Ms. Heckel was seen at Doctor On Call by Dr. John Vigil, who diagnosed Ms. Heckel with an unspecified episodic mood disorder and prescribed Celexa and Xanax. (AR 265.) Ms. Heckel saw Gayle Boyd, Ph.D., on February 20, 2009 for "required therapy" due to the domestic violence incident with her girlfriend. (AR 174, 289.) Dr. Boyd diagnosed Ms.

---

[7] The administrative record contains a medical record from August 2008 related to Ms. Heckel's treatment for a urinary tract infection. (AR 264.)

[8] Included in this count are providers who had direct contact with Ms. Heckel on at least one occasion and whose medical records were relied upon by the ALJ. Each provider included in the count is identified in the discussion below.

Heckel with an adjustment disorder with anxiety, primary support stressors, and a Global Assessment of Functioning (GAF) of 70,[9] and deferred diagnosis of any personality disorders. (AR 290.) Dr. Boyd's evaluation does not contain treatment notes or a treatment plan, though Ms. Heckel indicated that she had received "[t]alk therapy" from Dr. Boyd. Ms. Heckel was unable to continue therapy with Dr. Boyd because she could not afford it. (AR 174.)

**2010**

In March 2010 when she was incarcerated at MDC for aggravated assault against a household member, Ms. Heckel was referred for a psychological evaluation after she cut her arm and presented as "somewhat hopeless[.]" (AR 277.) She reported to the initial evaluator that she was on low doses of Seroquel and Abilify to treat her bipolar disorder, borderline personality disorder, anxiety, and posttraumatic stress disorder (PTSD). (AR 277.) That evaluator indicated that Ms. Heckel claimed to be compliant with her medications, though a different evaluator who assessed Ms. Heckel two days later noted that Ms. Heckel reported that her Seroquel prescription ran out at the end of December 2009. (AR 272, 276.) Ms. Heckel was initially placed in clinical seclusion for safety and observation (AR 277) and was eventually released to the general population but placed on suicide watch. (AR 279.) Upon discharge from MDC, Ms. Heckel was referred to the University of New Mexico Hospital (UNMH) for mental health treatment. (AR 268.) However, UNMH reported that it had no medical records around that time for Ms. Heckel. (AR 293.)

**2011**

---

[9] The GAF is "a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012). A GAF score between sixty-one and seventy is assessed when the patient is believed to have "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but [is] generally functioning pretty well, [with] some meaningful interpersonal relationships." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* 34 (4th ed., text rev. 2005).

On March 9, 2011, Ms. Heckel went to the UNM Psychiatric Center because she had started cutting herself again and was seriously contemplating suicide. (AR 346, 955, 1120.) She had been having suicidal thoughts starting in early 2011 (AR 218) and began planning to give away her cats and packing her stuff to give away to charity in anticipation of committing suicide. (AR 351.) Dr. Sonja Lymn recommended hospitalization for Ms. Heckel for safety, stabilization, and possible medication initiation. (AR 351-55.) Ms. Heckel was hospitalized from March 9 to March 11, 2011. (AR 356.) At the time of admission, Ms. Heckel was assessed with a GAF of 25; upon discharge, she was assessed with a GAF of 50.[10] At discharge, she was referred to psychotherapy, focusing on dialectical behavioral therapy (DBT), and deemed to be at a continued moderate to high risk of self-harm until she engaged in meaningful psychotherapy. (AR 357, 358.) She was also prescribed Celexa, 20 mg daily, to be taken "for emotional dysregulation and to increase response to DBT." (AR 357.)

On March 18, 2011, Dr. Kathryn Fraser, the medical director of the Continuing Care Clinic at the UNM Psychiatric Center, and Dr. Andrew Keyes, a resident at the clinic, completed an hour-and-a-half-long initial behavioral health assessment of Ms. Heckel. (AR 1120-24.) Their assessment stated, "The patient still has many problems on multiple fronts. She would benefit greatly from individual therapy, also would benefit greatly from DBT therapy, probably would benefit from antiadrenergic drugs as well, also increase in her Celexa." (AR 1123.) They opined that Ms. Heckel "is at extremely high chronic risk based on recent suicide attempts, recent discharge from inpatient hospitalization, little family support, no children, not [being] in a

---

[10] A GAF score between twenty-one and thirty is assessed when it is believed that the patient's behavior "is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas . . . ." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* 34 (4th ed., text rev. 2005). A GAF score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

relationship." (AR 1123.) They noted, however, that "[o]n the positive side, [Ms. Heckel] has support from the [UNM] Psychiatric Center, support from friends in the community, . . . a good medication regimen, high intellect, and . . . no acute stressors at this time." (AR 1123.) They increased Ms. Heckel's Celexa prescription from 20 mg per day to 40 mg per day based, in part, on "lack of current effect[,]" prescribed prazosin, and noted that other medications, including Neurontin for anxiety, Abilify, and Seroquel, should be considered in the future. (AR 1123.) Ms. Heckel's treatment plan also included that she would be referred for case management and psychotherapy, specifically DBT. (AR 1124.) Drs. Fraser and Keyes assessed Ms. Heckel with a GAF of 45 on that date. (AR 1123-24.)

At a follow-up appointment on April 8, 2011, Ms. Heckel reported that the prazosin seemed to be helping her control feelings of panic but that she had been unable to afford to fill the prescription for the increase in Celexa, though she planned to at the time of her next refill. (AR 1135.) She also reported feeling frustrated that she had not yet connected with a case manager or social worker due to a mix-up but indicated that her appointment had been rescheduled. (AR 1135, 1136.) Regarding her referral to psychotherapy, Ms. Heckel reported that she attended an orientation and was on a waiting list for DBT. (AR 1135.) Drs. Fraser and Keyes described Ms. Heckel as seeming to be "motivated" to engage in therapy and indicated in the treatment plan that she would check to make sure that Ms. Heckel was, indeed, on the waiting list. (AR 1136, 1137.) In addition to noting that the plan remained to increase the Celexa to 40 mg daily, they increased Ms. Heckel's prazosin prescription and prescribed her Ambien and Seroquel to be taken at bedtime based on Ms. Heckel's report of difficulty sleeping. (AR 1135-36, 1150.)

Two days later on April 10, 2011, Ms. Heckel sought help at UNM Psychiatric Emergency Services (PES) because she had been "having a 'manic and depressed' episode with symptoms of

decreased need for sleep, racing thoughts, increased energy, increased goal directed activity . . . , anhedonia, guilt, worthlessness, depressed mood, and passive suicidal ideation." (AR 1150.) She was treated for superficial lacerations on her left forearm and right upper thigh before being seen by Dr. Alicia Burbano. (AR 1143-44, 1152.) Ms. Heckel reported that the Ambien made her feel tired but that she was unable to sleep and ended up feeling "out of control, impulsive and more depressed with urges to cut herself and thoughts of wanting to die." (AR 1150.) She indicated that she did not want to be hospitalized, and based on Dr. Burbano's conclusion that Ms. Heckel did not present as a danger to herself or others and did not require hospitalization, she was discharged that same day with instructions to discontinue use of Ambien. (AR 1149, 1151.)

**2012**

The next medical record in the administrative record is dated August 30, 2012, the day Ms. Heckel established as a new patient with Dr. Francis Torres at First Nations Community Healthsource ("First Nations"). (AR 848.) She sought treatment for severe depression and reported that she had not taken any of her medications for approximately one year. (*Id.*) Dr. Torres transferred Ms. Heckel to PES based on Ms. Heckel's reported suicidal ideation with a plan to cut her femoral artery. (AR 848, 1146.) At PES, Ms. Heckel was seen by Dr. Peggy Rodriguez, who noted that Ms. Heckel denied previous inpatient psychiatric hospitalizations and reported experiencing "numerous social stressors[,] including impending homelessness," unemployment, and loss of general assistance. (AR 1146-47.) Dr. Rodriguez opined that Ms. Heckel was "likely to clear once acute emotional lability subsides and further support regarding her social stressors can be addressed" and kept Ms. Heckel for observation. (AR 1147.) Ms. Heckel was released that same evening by Dr. Jeffrey Dunn, who noted that Ms. Heckel was angry about being observed, denied active suicidal ideation, and was demanding to leave. (AR 1142-43.) (AR 1160-61.)

Ms. Heckel returned to First Nations on September 6, 2012 for a follow-up visit. (AR 846-47.) At that time, Dr. Torres diagnosed Ms. Heckel with bipolar disorder (unspecified) and started Ms. Heckel on Seroquel, Xanax, and Prozac. (AR 846.) At a follow up on September 20, 2012, Dr. Torres increased Ms. Heckel's Seroquel and Prozac dosages and continued her on the same dosage of Xanax. (AR 844.)

On Dr. Torres's referral, Ms. Heckel saw Dr. Michelle Pent at First Nations on October 2, 2012 for a psychiatric diagnostic evaluation. (AR 1211-13.) Dr. Pent noted that Ms. Heckel "presents with severe anxiety and emotional dysregulation" and opined that her "mood history is more consistent with affective dysregulation than bipolar illness." (AR 1212.) Dr. Pent diagnosed Ms. Heckel with, *inter alia*, borderline personality disorder, assessed her as having a GAF of 55-60, continued Ms. Heckel's prescriptions for Prozac and Seroquel, and added a prescription for Gabapentin to address Ms. Heckel's anxiety. (*Id.*) Dr. Pent additionally advised Ms. Heckel to discontinue cannabis use to improve her anxiety and mood symptoms. (*Id.*) Dr. Pent saw Ms. Heckel a second and final time on November 6, 2012, at which time Ms. Heckel reported overall compliance with her medication regimen but side effects from the Gabapentin, leading Dr. Pent to recommend discontinuation of Gabapentin. (AR 1214.) Dr. Pent noted that Ms. Heckel's referral to UNM for ongoing psychiatric care and DBT were pending and that her treatment of Ms. Heckel would end upon Ms. Heckel's transfer to UNM. (*Id.*) She assessed Ms. Heckel with a GAF of 60 on that date. (*Id.*)

**2013**

Ms. Heckel continued to follow up at First Nations with Dr. Torres and, later, with Jessica Tsabetsaye, PA-C for medication checks and refills. (AR 841, 842, 875, 877, 885, 888.) At a visit with PA-C Tsabetsaye in March 2013, Ms. Heckel requested a mental health referral due to

increased depression and anxiety and was referred to the UNM Psychiatric Center. (AR 885.) At a follow up in April 2013, Ms. Heckel informed PA-C Tsabetsaye that she had scheduled an appointment with the UNM Psychiatric Center but had stopped taking Seroquel and Gabapentin because she was not able to afford them. (AR 883, 885.) When she saw PA-C Tsabetsaye on June 11, 2013, Ms. Heckel admitted to having thoughts of suicide and hearing voices and indicated that she was being evicted from her apartment. (AR 877.) PA-C Tsabetsaye offered to arrange for an immediate psychiatric evaluation at UNM, which Ms. Heckel declined, indicating that she was scheduled to be seen at the UNM Mental Health Clinic on July 8, 2013. (AR 877-78.)

On July 8, 2013, Ms. Heckel underwent a psychological diagnostic interview with Dr. Jennifer Erickson at the UNM Psychiatric Center. (AR 878, 951, 1179-84.) Dr. Erickson assessed Ms. Heckel with a GAF of 48 and diagnosed her with an anxiety disorder, not otherwise specified, and an eating disorder, not otherwise specified. (AR 1182-83.) She noted a possible diagnosis of bipolar type 2 disorder but concluded that further investigation following resolution of then-present stressors—i.e., Ms. Heckel's inability to get Social Security disability and find stable housing, financial stressors, and isolation from her family—and continuing assessment would be needed to fully diagnose Ms. Heckel's mental health impairments. (AR 1183.) She adjusted Ms. Heckel's medications to address her anxiety symptoms and interpersonal sensitivity and indicated that a referral to therapy would also be beneficial. (*Id.*)

Dr. Erickson next saw Ms. Heckel in September 2013. (AR 1021.) Ms. Heckel informed Dr. Erickson that she had not attended counseling or started the DBT group due to transportation issues and being evicted from her residence. (AR 1019.) Dr. Erickson provided supportive psychotherapy, made additional adjustments to Ms. Heckel's medication regimen to try to improve Ms. Heckel's worsening mood and interpersonal sensitivity, and scheduled her for a follow-up

appointment. (AR 1021.) In October 2013, Ms. Heckel reported that her life was "still in chaos" due to difficulties she was experiencing with her new roommates, transportation, and paying for her medications, which she admitted to taking only intermittently. (AR 1015.) Dr. Erickson noted that Ms. Heckel had "slightly worsened mood and interpersonal sensitivity[,]" which she attributed in part to Ms. Heckel's lack of compliance with her medication regimen, but decided against making any adjustments to Ms. Heckel's medications. (AR 17.)

When Dr. Erickson saw Ms. Heckel again on December 5, 2013, she noted that Ms. Heckel had restarted her medications, which she believed likely accounted for Ms. Heckel's "notable improvement in her interpersonal sensitivity." (AR 1011, 1013.) Despite that Ms. Heckel continued to endorse "chaos in her life regarding her roommate, job searches, and Social Security [i]ncome[,]" Dr. Erickson made no further adjustment to Ms. Heckel's medications before transferring her care to the Recovery and Resiliency Program (RRP) for ongoing outpatient management. (*Id.*) Dr. Erickson assessed Ms. Heckel with a GAF of 40 in September, October, and December 2013. (AR 1013, 1017, 1020.)

On December 10, 2013, Ms. Heckel established as a new patient with CNS Capitano at RRP for medication management and supportive therapy. (AR 1008-10.) CNS Capitano noted that Ms. Heckel had a history of rage, aggression and impulsivity and would likely benefit from psychotherapy but also that Ms. Heckel expressed that she could not afford it. (AR 1010.) She maintained Ms. Heckel's medications and noted the possibility of adding a prescription for Clonidine at Ms. Heckel's next visit to address issues with aggression, a possibility that was noted throughout CNS Capitano's treatment of Ms. Heckel but never implemented. (AR 997, 1000, 1004, 1007, 1010.)

**2014**

Ms. Heckel continued to see CNS Capitano approximately every six weeks through the first half of 2014. (AR 994-1007.) During that time, CNS Capitano documented "partial response to treatment" based on Ms. Heckel's reports that her symptoms had improved; however, she also noted that certain symptoms, such as Ms. Heckel's night terrors and anxiety, may have increased due to stressors such as a brief period of homelessness Ms. Heckel experienced. (AR 996, 1000, 1004, 1005.) CNS Capitano adjusted and/or added to Ms. Heckel's medications at every visit during that time, first increasing Ms. Heckel's Prozac, then adding prazosin to treat Ms. Heckel's nightmares, then adding Alprazolam to treat Ms. Heckel's anxiety and anger, and finally adjusting Ms. Heckel's prazosin dosage. (AR 993, 997, 1000, 1004, 1007.) When CNS Capitano saw Ms. Heckel for a follow up in December 2014, she noted a significant increase in weight that Ms. Heckel experienced in the second half of 2014. (AR 993.) CNS Capitano attributed Ms. Heckel's weight gain to one of her medications, but Ms. Heckel believed it was related to her binge eating in response to anxiety she was experiencing. (*Id.*) CNS Capitano made no further adjustments to Ms. Heckel's medications other than to increase Ms. Heckel's Quetiapine (Seroquel) by 50 mg as needed for agitation and anxiety. (AR 993.)

While treating with CNS Capitano throughout 2014, Ms. Heckel also began weekly DBT counseling sessions in March 2014 at Counseling and Psychotherapy Institute (CPI). (AR 906-922.) After seeing a therapist named "Vicki" for the month, Ms. Heckel began treating with LMHC Brady on April 30, 2014 and continued seeing her on a weekly basis through December 2015. (AR 918-19, 1697-1701.) Ms. Heckel's treatment records from CPI consistently documented her struggle to find stable housing during the first half of 2014. (AR 913-18. [11]) The CPI treatment

---

[11] The Court notes that the majority of treatment notes provided by CPI identify Ms. Heckel's "Provider" as "Ken Wells" rather than either "Vicki" or LMHC Brady. Because it is unclear what, if any, treatment relationship Ms. Heckel had with Mr. Wells and whether the treatment notes attributed to Mr. Wells were, indeed, authored by him, the Court elects to discuss these records by reference to "CPI" generally.

notes indicate that Ms. Heckel received counseling on developing stress response techniques, practicing meditation and mindfulness exercises, learning how to monitor and act safely on "triggering" experiences, communicating in more positive, assertive ways with her landlord, and utilizing alternative coping mechanisms to binge eating and cutting. (AR 913, 914, 915, 918.)

### 2015[12]

Following the second denial of her application for benefits in 2015, Ms. Heckel continued to see LMHC Brady for DBT, though the management of her medications was transferred to Eva Velasquez, CNP, at Sage Neuroscience Center (Sage) after CNS Capitano retired. (AR 1693, 1697-1701.) While Ms. Heckel's medications were initially maintained at their then-current levels, they were eventually titrated, and she was started on other medications. (AR 1669, 1692, 1693.) CNP Velasquez started Ms. Heckel on Latuda and trazodone in May 2015 and increased the Latuda following a manic episode that Ms. Heckel reported having in mid-July. (AR 1686, 1690, 1692.) CNP Velasquez increased Ms. Heckel's trazadone and prazosin in September after Ms. Heckel reported having nightmares most nights. (AR 1683-84.) Ms. Heckel's treatment at Sage was transferred in November to Samantha Shannon, PA-C, who increased Ms. Heckel's Latuda dose again after Ms. Heckel reported increased feelings of depression. (AR 1679, 1681.)

### 2016

In February 2016, Ms. Heckel reported to PA-C Shannon that she was in compliance with her medication regimen but that the increased dose of Latuda had not improved her depression.

---

[12] Despite that Ms. Heckel's date of last insured was December 31, 2014, evidence after that date is relevant if it discloses the severity and continuity of impairments existing before that date. *See Baca v. Dep't of Health and Human Servs.*, 5 F.3d 476, 479 (10th Cir. 1993) ("Evidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to have been present and to have imposed limitations as of the earning requirement date." (alteration omitted)). The Court, therefore, proceeds to review Ms. Heckel's treatment history after December 31, 2014.

(AR 2000, 2003.) She attributed her worsening depression to losing LMHC Brady as her therapist at the end of 2015, having to go without Mijo, her therapy dog, for a week-and-a-half, a painful colonoscopy, and her friends being robbed at gunpoint during a home invasion, which triggered her PTSD. (AR 2002.) PA-C Shannon increased Ms. Heckel's Prozac and prazosin doses to try to address Ms. Heckel's increased depression and PTSD symptoms. (AR 2004.) She also indicated that therapy would be beneficial and that she would like to refer Ms. Henry to Sage's Behavioral Health Intensive Outpatient Program. (AR 2004.)

In March 2016, Ms. Heckel reported that the increases in Prozac and prazosin seemed to have improved her depression and PTSD, respectively. (AR 1994, 1998.) She also reported that she had started therapy sessions with Carol Henry, LPCC, at Sage. (AR 1996.) PA-C Shannon encouraged Ms. Heckel to continue regular therapy sessions and maintained all of Ms. Heckel's medications at the same levels. (AR 1998.) In April 2016, Ms. Heckel reported feeling "pretty good" and that her depression and PTSD had improved; PA-C Shannon made no changes to Ms. Heckel's medications at that time. (AR 1990, 1992.)

In June 2016, however, Ms. Heckel reported having increased symptoms of depression and PTSD, as well as more nightmares, stemming from incidents in her neighborhood such as gunshots, explosions, and someone cutting her fence. (AR 1981, 1984.) She also described feeling excessive sedation and fatigue. (AR 1983.) PA-C Shannon adjusted Ms. Heckel's medications by stopping trazodone in hopes of reducing Ms. Heckel's fatigue but otherwise continued Ms. Heckel's medications at their same doses. (AR 1985.) In July 2016, Ms. Heckel reported that she was no longer feeling fatigued and that her depression symptoms were manageable. (AR 1970, 1972.) She admitted to using cannabis to help manage her PTSD symptoms (anxiety, sleep, nightmares) and reported attending an art group every Tuesday and regular therapy sessions with

LPCC Henry. (AR 1973, 1974.) PA-C Shannon maintained Ms. Heckel's medications at the same doses and referred Ms. Heckel to the Depression and Anxiety Support Group at Sage as well as to Sage's Medical Cannabis Program. (AR 1958, 1974.) In August 2016, Ms. Heckel reported that her mood had been "fairly stable," although she acknowledged feeling some increased depression, anxiety, and PTSD symptoms as a result of the anniversary of a traumatic event. (AR 1963, 1967.) That month, she began using medical cannabis to help treat her PTSD. (AR 1958-62.) PA-C Shannon maintained Ms. Heckel's medications at their same doses. (AR 1967.) In October 2016, Ms. Heckel reported a slight increase in depression as well as an increase in PTSD symptoms. (AR 1951, 1955.) PA-C Shannon adjusted Ms. Heckel's medications, increasing her dose of prazosin and tapering her off buspirone. (AR 1955-56.)

**2017**

Ms. Heckel continued to see PA-C Shannon and LPCC Henry throughout 2017. (AR 1888-1944, 2039-2074.) She generally reported that her medications, with which she complied, seemed to be working and that her symptoms and mood were stable. (AR 1923, 1930, 1944.) However, she also reported increased symptoms triggered by particular events, such as the anniversary of a traumatic event or her birthday (AR 1907, 1937), as well as two, week-long manic periods, one in June and the other in December. (AR 1888, 1923.) PA-C Shannon and LPCC Henry continued providing supportive psychotherapy, including working with Ms. Heckel on techniques to reduce anxiety and better cope with the various psychological stressors she continually experienced. (AR 1887, 1897, 1907, 1923, 1930, 1937, 1944, 2039-2074.) Because Ms. Heckel indicated that her increased symptoms were "situational" and expressed satisfaction with her medications, PA-C Shannon did not make any adjustments to Ms. Heckel's medications. (AR 1937.)

**C.    Medical Source Statements**

Because of the number and centrality of the medical opinions in this case, the Court next documents and synthesizes the various medical source statements in the record that were relied upon by the ALJ.

**Non-Treating "Acceptable" Medical Source Opinions**

After Ms. Heckel applied for disability benefits in July 2010, SSA referred her for a consultative psychological evaluation with Dr. Spies, which took place in November 2010. (AR 297.) Dr. Spies diagnosed Ms. Heckel with bipolar 1 disorder, PTSD, polysubstance dependence, bulimia nervosa (purging type), obsessive-compulsive disorder (OCD), and borderline personality disorder. (AR 300.) She noted that Ms. Heckel was not taking any medications or receiving therapy at that time and assessed Ms. Heckel with a GAF of 35.[13] (AR 298, 300.) After reviewing Ms. Heckel's history and relating her diagnostic impressions, Dr. Spies opined:

> This individual['s] ability to understand and remember detailed or complex instructions is moderately limited. Her ability to attend and concentrate is moderately limited and her ability to work without supervision seems to be mildly limited. This client is unable to interact with the public, with coworkers, or supervisors. Her ability to adapt to changes, use public transportation, or react appropriately to normal hazards is markedly limited.

(AR 300.)

Dr. Gucker completed a mental residual functional capacity assessment (MRFCA) and psychiatric review technique form (PRTF) in January 2011 based on a telephonic interview with Ms. Heckel and his review of the medical evidence of record, comprising (1) the January 2009 psychological evaluation performed at MDC, (2) Dr. Boyd's February 2009 report from her one session with Ms. Heckel, (3) Dr. Spies' November 2010 consultative psychological evaluation,

---

[13] A GAF score between thirty-one and forty is assessed when the patient is believed to have "[s]ome impairment in reality testing or communication . . . OR major impairment in some areas, such as work or school, family relations, judgment, thinking, or mood . . . ." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* 34 (4th ed., text rev. 2005).

and (4) a consultative medical examination completed by Dr. Harry Burger in December 2010. (AR 311-27.) In Section I of his MRFCA, Dr. Gucker opined that Ms. Heckel was moderately limited in a number of areas, including her ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers. (AR 310-11.) However, in Section III, Dr. Gucker stated:

> Although the examiner finds marked limitations in his one[-]time visit with [Ms. Heckel], the examiner's narrative and mental status examination and the DAR's would support more moderate functional abilities.
>
> All considered, the allegations by [Ms. Heckel] are not fully supported by the [medical evidence of record], and it appears that when compliant with medical [treatment], [prescribed] med[ication]s, and when no[t] using illegal substances and [alcohol], [Ms. Heckel] can understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting.

(AR 312.) In the narrative section of the PRTF, Dr. Gucker discussed his impressions regarding the medical evidence of record. He discounted a number of Dr. Spies's conclusions—including that Ms. Heckel is "unable to interact with the public, with coworkers, or supervisors"—because he believed that they were "based simply on the self-report of [Ms. Heckel] and are at total variance with the mental status report of Dr. Boyd dated 2/20/09 and the medical [consultative evaluation] by Dr. B[u]rger." (AR 326.)

In May 2011, State agency psychological consultant Renate Wewerka, Ph.D., completed a mental assessment as part of Ms. Heckel's concurrent DI/DIB reconsideration. (AR 368.) Dr. Wewerka reviewed Ms. Heckel's recent hospitalization and treatment records from PES and concluded that while those records indicated that Ms. Heckel has "some passive s[uicidial]

i[deation]," with treatment, Ms. Heckel's mental health status examination was "near normal" and her GAF was "in the 50's."[14] (*Id.*) She concluded that Ms. Heckel's reported limitations associated with her psychological impairments "are consistent with capacity for unskilled work" and affirmed Dr. Gucker's January 2011 MRFCA and PRTF. (*Id.*)

In June 2014, State agency psychological consultant Jerry Henderson, Ph.D., completed an MRFCA as part of a disability determination. (AR 517-530.) Dr. Henderson found moderate limitations in Ms. Heckel's ability to (1) carry out detailed instructions, (2) ability to maintain attention and concentration for extended periods, (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (4) sustain an ordinary routine without special supervision, (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without and unreasonable number and length of rest periods, (6) interact appropriately with the general public, (7) accept instructions and respond appropriately to criticism from supervisors, (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, (9) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, (10) respond appropriately to changes in the work setting, (11) travel in unfamiliar places or use public transportation, and (12) set realistic goals or make plans independently of others. (AR 526-27.) Based on his findings, Dr. Henderson opined that Ms. Heckel was limited to performing unskilled work. (AR 527, 529.) In October 2013, State agency psychological consultant Julian Lev, Ph.D., affirmed Dr. Henderson's findings. (AR 555-57.)

---

[14] A GAF score between fifty-one and sixty is assessed when the patient is believed to have "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* 34 (4th ed., text rev. 2005).

In June 2016, State agency psychological consultant Suzanne Castro, Psy.D., completed an MRFCA as part of another disability determination, covering the period from March 7, 2015 to June 1, 2016. (AR 1363-73.) Dr. Castro found that Ms. Heckel was moderately limited in her ability to (1) carry out detailed instructions, (2) maintain attention and concentration for extended periods, (3) work in coordination with or in proximity to others without being distracted by them, (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without and unreasonable number and length of rest periods, (5) accept instructions and respond appropriately to criticism from supervisors, and (6) respond appropriately to changes in the work setting (AR 1371-73.) She also found that Ms. Heckel has a marked limitation in her ability to interact appropriately with the general public. (AR 1372.) She explained, "[Ms. Heckel] is capable of completing simple, routine tasks in a non-public setting. [Ms. Heckel] is capable of occasional and superficial interaction with co-workers in a routine setting." (AR 1373.) Unlike Dr. Henderson, she did not believe that Ms. Heckel was limited to doing unskilled work. (AR 1374.) State agency psychological consultant Maurice Prout, Ph.D., affirmed Dr. Castro's evaluation in September 2016. (AR 1388-90.)

Dr. Spies again evaluated Ms. Heckel in 2018 at the request of SSA.[15] (AR 297, 2232.) As in 2010, she assessed Ms. Heckel as having marked limitations in her ability to (1) interact with the public, coworkers, and supervisors, and (2) adapt to change, use public transportation, or react appropriately to normal hazards. (AR 300, 2235.) Regarding Ms. Heckel's ability to understand and remember detailed instructions, Dr. Spies assessed Ms. Heckel as having a marked limitation in 2018 where she had assessed only a moderate limitation in 2010. (*Id.*) She additionally noted a

---

[15] Dr. Spies did not complete an MRFCA. She included her assessments of Ms. Heckel's limitations in the narrative Summary and Recommendations sections of her psychological evaluations. (AR 297-300, 2232-2236.)

moderate limitation in Ms. Heckel's ability to understand and remember simple directions in 2018. (AR 2235.)

### **Treating "Other" Medical Source Opinions**

Each of Ms. Heckel's treating providers—i.e., CNS Capitano, LMHC Brady, PA-C Shannon, and LPCC Henry—completed a Medical Assessment of Ability to do Work-Related Activities (Mental) form (hereinafter "medical source statement") assessing Ms. Heckel's functional limitations. (AR 853-54, 940-41, 1007-2008, 2020-21.) LMHC Brady completed her medical source statement in June 2014 after treating Ms. Heckel six times. (AR 854.) At Ms. Heckel's administrative hearing in January 2015—by which time LMHC Brady had seen Ms. Heckel more than two dozen times (AR 1706-1710)—LMHC Brady testified that she continued to stand by her earlier assessment of Ms. Heckel's limitations and further that she believed Ms. Heckel was neither medically stable nor able to return to work at that time. (AR 441, 444-45.) CNS Capitano completed her medical source statement in December 2014 after treating Ms. Heckel half a dozen times in the preceding year. (AR 941.) LMHC Brady and CNS Capitano each assessed Ms. Heckel as having moderate or marked limitations in all of the twenty different activities assessed, with more than half the limitations considered marked. (AR 853-54, 940-41.)

PA-C Shannon completed her medical source statement in December 2017 after treating Ms. Heckel on roughly a monthly basis for more than two years. (AR 2008.) LPCC Henry completed hers in January 2018 after treating Ms. Heckel on a weekly basis for nearly two years. (AR 2021.) PA-C Shannon and LPCC Henry each assessed Ms. Heckel with mostly moderate and marked limitations, though unlike LMHC Brady and CNS Capitano, they each assessed Ms. Heckel as having only slight limitations in a few activity areas. (AR 2007-2008, 2020-2021.)

However, like Ms. Heckel's other treating providers, PA-C Shannon and LPCC Henry assessed Ms. Heckel as having marked limitations in at least half of the activities assessed. (*Id.*)

While the four treating providers' opinions varied as to the severity of Ms. Heckel's limitations in certain areas, they all assessed Ms. Heckel as having marked limitations in the following areas:

1. The ability to understand and remember detailed instructions;
2. The ability to work in coordination with/or proximity to others without being distracted by them;
3. The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable time and length of rest periods;
4. The ability to accept instructions and respond appropriately to criticism from supervisors;
5. The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and
6. The ability to respond appropriately to changes in the workplace.

(AR 853-54, 940-41, 2007-2008, 2020-2021.) They also all assessed Ms. Heckel as having at least moderate, if not marked, limitations, in the following areas:

1. The ability to carry out detailed instructions;
2. The ability to maintain attention and concentration for extended periods of time (i.e., 2-hour segments);
3. The ability to make simple work-related decisions;
4. The ability to be aware of normal hazards and take adequate precautions;
5. The ability to travel in unfamiliar places or use public transportation; and
6. The ability to set realistic goals or make plans independently of others.

(*Id.*)

## D.     The ALJ's 2018 Decision

ALJ Farris made her decision at step five of the sequential evaluation. At step one, she determined that Ms. Heckel has not engaged in substantial gainful activity since the alleged onset date of November 4, 2009. (AR 1230.)   At step two, she found that Ms. Heckel has had the following severe impairments as of November 4, 2009: (1) bipolar disorder; (2) PTSD; (3) polysubstance abuse; (4) bulimia; (5) borderline and anti-social personality disorders; and (6) a

panic disorder. (*Id.*) The ALJ further found that beginning on June 1, 2015, Ms. Heckel's osteoarthritis of the hips and bilateral carpel tunnel syndrome were severe impairments.[16] (*Id.*) The ALJ also found that Ms. Heckel has the non-severe impairments of plantar fascial fibromatosis, irritable bowel syndrome, obstructive sleep apnea, and lumbar spine condition. (AR 1230-31.) The ALJ, however, determined at step three that Ms. Heckel's impairments do not meet or medically equal the severity of one of the listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (AR 1231.) As a result, the ALJ proceeded to step four and assessed Ms. Heckel's RFC.

ALJ Farris found that prior to June 1, 2015, Ms. Heckel had the RFC to perform a full range of work at all exertional levels but was limited to "simple, work-related decisions with few workplace changes[,] . . . no interaction with the public, and only occasional and superficial interactions with co-workers." (Hereinafter "pre-June RFC".) (AR 1232.) The ALJ found that beginning on June 1, 2015, however, Ms. Heckel has the RFC to perform only light work with the additional exertional limitations that "she cannot be required to kneel, crouch, or crawl as part of her job duties, and she can only occasionally handle and finger." (AR 1241.) (Hereinafter "June RFC".) The pre-June RFC non-exertional limitations remained the same. (*Id.*) Also in step four, the ALJ concluded that Ms. Heckel has been unable to perform any of her past relevant work since November 4, 2009. (AR 1243.)

Proceeding to step five, the ALJ determined that prior to June 1, 2015, Ms. Heckel was not disabled because based on her pre-June RFC, age, education, and work experience and the VE's testimony, there were jobs that existed in significant numbers in the national economy—to wit, cleaner/housekeeping, hospital cleaner, and router—that Ms. Heckel could perform. (AR 1243-

---

[16] The ALJ found that prior to June 1, 2015, Ms. Heckel's arthritis of the hip was a non-severe impairment. (AR 1230.)

44.) However, the ALJ found that beginning on June 1, 2015, Ms. Heckel was disabled because there are no jobs that exist in significant numbers in the national economy that Ms. Heckel can perform based on her June RFC, age, education, and work experience. (AR 1245.)

### The ALJ's Explanation Supporting the Non-Exertional Limitations Contained in the Pre-June RFC

ALJ Farris explained that her pre-June RFC assessment "is supported by [Ms. Heckel's] treatment records, her spotty compliance with medication and mental health counseling, her good response to treatment when she is compliant, and her daily activities." (AR 1241.) She gave "little weight" to Ms. Heckel's treating providers' assessments of Ms. Heckel's limitations but "significant weight" to the evaluations of the State agency psychological consultants. (AR 1236, 1237-39.)

The reasons the ALJ gave for discounting the treating providers' evaluations were:

I give little weight to [LHMC] Brady's evaluation since it relies heavily on the claimant's self-reporting. In addition, it is not consistent with the claimant's response to treatment noted in her treatment records.

. . . .

I give little weight to [CNS] Capitano's evaluation, since it is not consistent with the claimant's treatment records, including those from Dr. Capitano, showing a good response to mental health treatment and the ability to engage in activities such as bartering with her landlady for rent and being involved in church activities.

. . . .

I give little weight to [PA-C] Shannon's assessment of the marked limitations . . . since they are not consistent with the claimant's treatment records, her response to mental health treatment when she follows it, and her daily activities.

. . . .

. . . I give little weight to the marked limitations [LPCC] Henry assessed, since they are not consistent with the claimant's treatment records, her response to mental health treatment, and her daily activities. [LPCC] Henry's own treatment records show the claimant had a happy mood and that she was keeping busy with various

activities. I also note that [LPCC] Henry noted that the claimant's medications helped[.]

(AR 1237-39) She gave significant weight to the State agency psychological consultants' assessments because "they are consistent with the record as a whole, including the objective clinical findings, the claimant's compliance with mental health treatment and medication, her response to mental health treatment when she is compliant, and her daily activities." (AR 1236.)

## E.      The Parties' Arguments

Ms. Heckel argues that the ALJ's 2018 decision fails to (1) provide adequate reasons for rejecting the opinions of LMHC Brady and CNS Capitano, and (2) account for all the "moderate" findings of Drs. Castro and Prout.  (Doc. 23 at 1.)  She contends that the ALJ's conclusory statements regarding why she gave "little weight" to the opinions of LMHC Brady and CNS Capitano are inadequate to support her determination. (*Id.*) Ms. Heckel further argues that the ALJ engaged in impermissible picking and choosing of the opinions of Drs. Castro and Prout. (*Id.* at 20-21.)  She specifically complains that the ALJ's RFC fails to reflect Drs. Castro's and Prout's opinions that Ms. Heckel had moderate limitations in the ability to (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and (2) accept instructions and respond appropriately to criticism from supervisors. (*Id.* at 21.)

The Commissioner responds that the ALJ provided adequate reasons for discounting the opinions of LMHC Brady and CNS Capitano. (Doc. 25 at 10-13.) While conceding that "the ALJ's analysis could have been more detailed," the Commissioner contends that the ALJ's analysis sufficiently allows this Court to follow her reasoning as to why she gave little weight to LMHC Brady's and CNS Capitano's opinions. (*Id.* at 13.) Regarding Drs. Castro and Prout, the Commissioner does not specifically address Ms. Heckel's argument that the ALJ failed to account

for their specific opinions regarding Ms. Heckel's limitations with respect to completing a normal work day and interacting with supervisors. Instead, the Commissioner argues generally that the ALJ accounted for all of Ms. Heckel's moderate limitations by limiting her to certain kinds of work activity, i.e., simple work with limited contact with coworker and no contact with the public. (*Id.* at 14-16.)

## II. <u>Applicable Law</u>

### A. Standard of Review

This Court must affirm the Commissioner's final decision unless: (1) "substantial evidence" does not support the decision; or, (2) the ALJ did not apply the correct legal standards in reaching the decision.[17] 42 U.S.C. §§ 405(g), 1383(c)(3); *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (alteration and quotation marks omitted). The Court must meticulously review the entire record but may "neither reweigh the evidence nor substitute [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quotation marks omitted); *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118 (quotation marks omitted). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record

---

[17] Judicial review is limited to the Commissioner's final decision, which is generally the ALJ's decision. *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1155 n.1 (D.N.M. 2016). "This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision." *Id.*

or if there is a mere scintilla of evidence supporting it." *Id.* (quotation marks omitted). Although the Court may not re-weigh the evidence or try the issues *de novo*, its consideration of the record must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "We consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but we will not reweigh the evidence or substitute our judgment for the Commissioner's." *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005) (citation and quotation marks omitted).

### B.    Consideration and Weighing of Medical Opinions

"There are specific rules of law that must be followed in weighing particular types of evidence in disability cases." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988). "Failure to follow these rules constitutes reversible error." *Id.* Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence[.]" *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ must discuss not only the evidence supporting her decision but also "the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Id.* at 1010; *see* SSR 96-5P, 1996 WL 374183, at *5 (July 2, 1996) ("Adjudicators must weigh medical source statements . . . , providing appropriate explanations for accepting or rejecting such opinions."). In particular, "when assessing a plaintiff's RFC, an ALJ must explain what weight is assigned to each opinion and why." *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1157 (D.N.M. 2016); *see* SSR 96-6P, 1996 WL 374180, at *4 (July 2, 1996) (providing that an ALJ "must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians or psychologists"). "[T]here is no requirement in the regulations for a direct

correspondence between an RFC finding and a specific medical opinion on the functional capacity in question. The ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (alteration and quotation marks omitted). However, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996).

The ALJ must consider "all relevant evidence in the case record" in making a disability determination. SSR 06-03P, 2006 WL 2329939, at *4 (Aug. 9, 2006). Evidence that must be considered includes, but is not limited to, opinions from both "acceptable medical sources" and medical sources who are not "acceptable medical sources."[18] *Id.* at *1, 4. The weight to which opinion evidence may be entitled "will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors," including: how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairments; and any other factors that tend to support or refute the opinion. *Id.* at *4-5. While not entitled to controlling weight, an opinion from an "other" medical source must still be considered, and the ALJ must decide what weight, if any, to give it. *Id.* at *3-4. "The fact that a medical opinion is from an 'acceptable medical source' is a factor that *may* justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source'[.]" *Id.* at * 5

---

[18] "Acceptable medical sources" comprise licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *Id.*at *1. Medical sources who are not "acceptable medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. *Id.* at * 2.

(emphasis added). "However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Id.* "Moreover, findings of a nontreating physician based on limited contact and examination are of suspect reliability." *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987).

Because of the requirement to consider all relevant evidence in the case record, the case record should reflect the ALJ's consideration of opinions from all sources, i.e., acceptable medical sources, other medical sources, and non-medical sources. SSR 06-03P, 2006 WL 2329939, at * 6. "Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* An ALJ's failure to set forth adequate reasons explaining why a medical opinion was assigned a particular weight may constitute reversible error. *See Reyes*, 845 F.2d at 244.

### III. <u>Analysis</u>

**A.     The ALJ did not provide adequate reasons for the weight she assigned to LMHC Brady's and CNS Capitano's opinions.**

ALJ Farris's explanations of why she effectively rejected the opinions of LMHC Brady and CNS Capitano are vague and conclusory and fail to allow this Court to follow her reasoning.

**1.     LMHC Brady**

Regarding LMHC Brady, the ALJ's first reason for rejecting her opinion was that it "heavily relies on [Ms. Heckel's] self-reporting." (AR 1237.) In the first decision she issued, ALJ Farris found that "all of [LMHC] Brady's explanations about [Ms. Heckel's] limitations and ability to perform certain job characteristics are based on [Ms. Heckel's] reports to her." (AR 402.) The Court does not agree with either of the foregoing characterizations, which are not supported by substantial evidence and are speculative at best.

The Commissioner correctly points out that an ALJ may reasonably discount a medical opinion that merely recites the claimant's complaints. (Doc. 25 at 11.) *See Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009) (concluding that the ALJ properly declined to give controlling weight to the opinion of a doctor whose "brief" notations simply recited the claimant's complaints, did not appear to be based on a physical examination, provided little analysis of the claimant's limitations, and were inconsistent with other medication evidence in the record). Additionally, an ALJ is not required to assign weight at all to a medical source's narrative of statements relayed to him by the claimant where that narrative does not express an opinion of any sort. *Keyes-Zachary*, 695 F.3d at 1163-64. However, neither of those scenarios represents the circumstances present in this case, and the ALJ's presentation of the evidence suggesting otherwise is not consistent with the record overall.

It is true that in filling out her medical source statement regarding Ms. Heckel's ability to do work-related activities, LMHC Brady included in the "Comments" sections of the form various things that Ms. Heckel presumably reported during therapy sessions regarding her feelings about and reactions to different situations. (AR 853-54.) For example, after assessing Ms. Heckel as having marked and moderate limitations in all areas of social interaction, LMHC Brady noted in the "Comments" section, "Pt reports having trouble being out in public. Pt reports becoming

annoyed at people wanting to pet her service dog. Pt reports limiting activities to basic needs[,] such as appointments—church, grocery. Pt reports criticism from authority figures creates triggers for her." (AR 854.) However, that LMHC Brady relayed Ms. Heckel's specific reports that tended to support the level of limitation assessed does not, on this record, support the conclusion that LMHC "based" her assessments on Ms. Heckel's self-reporting such that those assessments may be rejected outright. As the Tenth Circuit has recognized, "The practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements." *Thomas v. Barnhart*, 147 F. App'x 755, 759 (10th Cir. 2005) (unpublished). Thus, a mental health professional's opinion may be based on not only objective psychological tests but also "observed signs and symptoms," including the claimant's subjective reports. *Id.* (quotation marks omitted).

The record evinces that LMHC Brady engaged in dialectical behavioral therapy with Ms. Heckel on a weekly basis for twenty months, providing her with numerous opportunities to independently observe Ms. Heckel for indications of limited work-related functioning. (AR 441-44, 906-08, 1697-1701.) At the January 2015 hearing before ALJ Farris, LMHC Brady offered observations regarding Ms. Heckel's reliance on Mijo, her therapy dog. Specifically, she explained, "Mijo seems to be kind of the center of what helps to keep [Ms. Heckel] at a calm state of mind. The dog is there basically any time that she starts to have any sort of anxiety, it actually shows in her mannerisms and also actually in her speech, and the dog is very attentive to that instantly so basically she feels very safe with her dog." (AR 443.) LMHC Brady's observation about Ms. Heckel's interaction with Mijo is consistent with what is documented in other contemporaneous treatment records. For example, another CPI treatment note documented that Ms. Heckel would "pet the service dog to help calm her when she would talk about her concerns with her landlord" and "pet and love on her work dog when she would start to become upset." (AR

916, 918.) To the extent ALJ Farris was concerned that LMHC Brady based her assessment of Ms. Heckel's limitations entirely or primarily on Ms. Heckel's self-reporting and had not sufficiently explained her opinion, she had a duty to "seek additional evidence or clarification" from LMHC Brady. *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (quotation marks omitted) (citing 20 C.F.R. §§ 404.1512(e)(1) and 416.912(e)(1)); *Garcia v. Barnhart*, 188 F. App'x 760, 764 (10th Cir. 2006) (unpublished) (explaining that when an ALJ rejects a medical opinion based on speculation that the basis for that opinion was formed by the claimant's subjective reports, "the ALJ deviates from correct legal standards and his decision is not supported by substantial evidence"); SSR 85-16, 1985 WL 56855, at * 3 (January 1, 1985) ("When medical source notes appear to be incomplete, recontact with the source should be made to attempt to obtain more detailed information."). However, when she had the opportunity to question LMHC Brady at the hearing, ALJ Farris asked LMHC Brady only to verify that she was Ms. Heckel's therapist, what her professional qualifications were, and to confirm that Ms. Heckel always brought Mijo to her appointments with LMHC Brady. (AR 441-42.) ALJ Farris made no inquiry into or sought clarification regarding the basis for LMHC Brady's assessment that Ms. Heckel has marked and moderate limitations in her ability to perform work-related activities. She then relied in her written decision on ambiguities in the medical records from CPI[19] and the fact that those records appeared to contain only one treatment note from LMHC Brady to discount LMHC Brady's opinion. (AR 403.) The Court thus concludes that the ALJ's first reason for according "little weight" to LMHC Brady's opinion is not supported by substantial evidence.

The other reason the ALJ gave is that she found LMHC Brady's evaluation to be "not consistent with the claimant's response to treatment noted in her treatment records." (AR 1237,

---

[19] *See* n.11 *supra*.

1238.) The only treatment record the ALJ discussed was "the one treatment note" she concluded LMHC Brady wrote. (AR 403.) The ALJ described that treatment note as one in which LMHC Brady "noted that things had been going well for [Ms. Heckel] in October 2014." (*Id.*) That not only mischaracterizes the evidence but also reveals that the ALJ failed to consider all the relevant evidence and account for probative and contradictory evidence that she was rejecting. The "assessment" portion of LMHC Brady's October 29, 2014 note provided in its entirety:

> Pt has been experiencing [*illegible*] mood swings in the past month. Pt shared about the difficulty she has had most [of] her life during the holidays. Pt has been focusing on developing new traditions for the holidays to avoid falling into unhealthy past behaviors. Pt missed her last scheduled appointment with her Psychiatric doctor at UNM and is unable to see her again until December 2014. Pt is in need of having her medication dosages checked and in need of refills on at least several scripts. *Counselor strongly suggested client go to UNM emergency clinic and report her current behaviors in order to be seen prior to December.* Pt has been becoming more in tune and aware of subtle shifts in her mood and has been quicker to respond to the changes. Pt also wondered if maybe some of her anxiety is due to her expecting 'one more shoe to fall' but instead things have been going well for her.

(AR 910 (emphasis added).) LMHC Brady's suggestion to Ms. Heckel that she go to the UNM emergency clinic for an immediate medication adjustment was apparently prompted by Ms. Heckel's report to LMHC Brady that she had been "shoplifting excessively . . . as a coping mechanism to her anxiety" and that she had had "a 'disturbing vision' of killing her ex-roommate and had details of how she could do it." (AR 909.) The Court additionally notes that the treatment note from Ms. Heckel's session the following week at CPI provides, "Pt presents to be moving into a down slope of depression but continues to make efforts to stay engaged in activities and push through her feelings to isolate. Pt has been prescribed an increase of dosage for [S]eroquel and will be seeing her psychiatrist to address the increased amount of voices in her head." (AR 909.) Considering the foregoing, the Court concludes that the ALJ's second reason for discounting

LMHC Brady's opinion is also inadequate because it is based on a mischaracterization of the record and is not supported by substantial evidence.

## 2.    CNS Capitano

The ALJ similarly accorded "little weight" to CNS Capitano's opinion because she concluded that it "is not consistent with [Ms. Heckel's] treatment records, including those from Dr. Capitano, showing a good response to mental health treatment and the ability to engage in activities such as bartering with her landlady for rent and being involved in church activities." (AR 1238.) As support, the ALJ cited a single treatment note from CNS Capitano in which CNS Capitano documented the history of Ms. Heckel's present illness as of December 2014 as follows:

> Patient presents to RRP clinic for medication management. She feels 'better' regarding her mood, less anger and irritability and she is able to control her impulsivity to a greater degree than previous visits. The situation with housing remains problematic. She sometimes feels like a 'maid' to her landlady since she has bartered her time in exchange for room and board. She . . . does not feel 'secure' in her housing situation because she feels she can be 'asked to leave at anytime.' . . . Night terrors have improved.

(AR 1235, 1641.) That the record tends to establish that Ms. Heckel's mental health impairments had improved and could be managed—at least to the point that Ms. Heckel was no longer actively suicidal, felt "less" angry and irritable, was less impulsive, and was no longer experiencing night terrors on a nightly basis[20]—by making ongoing adjustments to her medication regimen and through her engagement in intensive weekly therapy does not itself support rejection of CNS Capitano's opinion. Even assuming arguendo that the record supports the ALJ's finding that Ms. Heckel showed a "good response to mental health treatment," the ALJ failed to explain how CNS Capitano's assessment of Ms. Heckel's limitations are "not consistent" with that finding.

---

[20] In September 2015, Ms. Heckel reported having "nightmares almost every night" to CNP Velasquez. (AR 1683.) CNP Velasquez increased two of Ms. Heckel's medications, and Ms. Heckel reported to PA-C Shannon in December 2015 that her nightmares had "decreased," which she attributed to use of a CPAP machine. (AR 1684, 1675.)

Likewise, the ALJ failed to explain—and the Court fails to see—how Ms. Heckel's purported ability to "barter with her landlady" and attend church once a week renders CNS Capitano's opinions regarding Ms. Heckel's ability to do work-related activities relegable. Social Security Ruling 85-16 provides, "[i]n analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individual's strengths and weaknesses." SSR 85-16, 1985 WL 56855, at *2 (January 1, 1985). It further provides that consideration should be given to factors such as (1) quality of daily activities, both in occupational and social spheres, (2) ability to sustain activities, interests, and relate to others over a period of time, and (3) ability to function in a work-like situation. *Id.* The ALJ's discussion does not evince compliance with the foregoing standards and fails to provide a sufficient explanation that allows the Court to follow her reasons for effectively rejecting CNS Capitano's opinion.

For the foregoing reasons, the Court concludes that the ALJ's explanations of why she accorded "little weight" to the opinions of LMHC Brady and CNS Capitano are not supported by substantial evidence and are, indeed, undercut and overwhelmed by other evidence in the record. Notably, the specific examples of the ALJ relying on mischaracterized, decontextualized facts discussed above are not the only such instances in the record. The Court finds that the ALJ's narrative discussion supporting her pre-June RFC assessment generally lacks meaningful explanations regarding how the various pieces of evidence she cites—much of it seemingly cherrypicked—bear upon the ultimate question of how Ms. Heckel's limitations affect whether she retains the capacity to do other work on a sustained basis. *See* SSR 96-8P, 1996 WL 374184, at *7 ("In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[.] . . . The adjudicator must also explain how

any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."). While the Court's foregoing discussion focuses on the inadequacy of the ALJ's analysis with respect to LMHC Brady and CNS Capitano, similar problems exist throughout the ALJ's discussion of the evidence supporting her RFC assessment. In general, the ALJ's discussion is little more than a compilation of descriptive summaries of individual medical records followed by unsupported conclusory statements as to the import of the evidence selected for inclusion. It offers no analysis explaining the relevance of and weight assigned to evidence cited, e.g., the widely varying and unexplained GAF scores assessed by different evaluators and providers,[21] and how it supports the ALJ's ultimate RFC determination, rendering it inherently deficient. The Court points this out to emphasize the need for the SSA, in what will now be its fourth consideration of Ms. Heckel's application, to not only fully comply with all applicable procedures and standards governing its review of Ms. Heckel's case but also render evident that compliance through the issuance of a clear and well-reasoned decision.

**B.    The Court does not reach Ms. Heckel's other claim of error.**

Because remand is required based on the ALJ's failure to adequately support the weight she assigned to LMHC Brady's and CNS Capitano's opinions, the Court does not address the merits of Ms. Heckel's argument that the ALJ failed to account for Drs. Castro and Prout's

---

[21] The ALJ gave "moderate weight" to Dr. Boyd's February 2009 GAF score of 70 and "some weight" to Dr. Pent's 2012 GAF scores of 55-60 (August) and 60 (October). (AR 1234, 1236.) For all other GAF scores cited in her decision—Dr. Spies's GAF score of 35 in November 2010; Dr. Lymn's GAF scores of 25 and 50 on March 9 and 11, 2011, respectively; Drs. Fraser and Keyes' GAF score of 45 on March 18, 2011; Dr. Erickson's GAF scores of 48 in July 2013 and 40 in September, October, and December 2013—the ALJ assigned them "little weight." (AR 1234, 1235, 1237.) Because of the disjointed nature of the ALJ's narrative, it is unclear how the ALJ's assignment of weight to GAF scores affected her determination of Ms. Heckel's RFC. Regardless, on the record before the Court, the ALJ's discussion of GAF scores fails to reflect compliance with the applicable legal standard. *See, e.g.*, *Drummond v. Astrue*, 895 F. Supp. 2d 1117, 1131-32 (D. Kan. 2012) (analyzing cases that discuss the evaluation of GAF scores and noting that "it must be remembered that a GAF score without a narrative explanation from the source of the score is of little value in determining the severity of the claimant's impairments or the limitations resulting from his [or her] impairments" and further that "[w]here record evidence (the GAF score) is inconsistent on its face with the ALJ's findings, that inconsistency must be resolved").

assessment of moderate limitations in Ms. Heckel's ability to (1) accept instructions and respond appropriately to criticism from supervisors, and (2) complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court need not reach issues raised that "may be affected by the ALJ's treatment of th[e] case on remand"). The Court notes, however, that the ALJ's uniform assignment of "significant weight" to the evaluations of the State agency psychological consultants is problematic and presents an analytic challenge that should be addressed on remand as well. Specifically, the ALJ's decision—which appears to be internally inconsistent and at the very least is ambiguous—fails to address or meaningfully explain material differences between the six State agency psychological consultants' assessments, which are decidedly not identical.[22] As with the ALJ's failure to provide adequate reasons for discounting the opinions of LMHC Brady and CNS Capitano, the ALJ's failure to clearly explain her assessment of the State agency psychological consultants' respective assessments leaves the Court unable to follow her reasoning and unable to determine whether she erred in failing to account for certain moderate limitations that appear to be—though arguably may not be—uncontroverted. Like the other deficiencies explained herein, this issue must be addressed on remand in order to facilitate future review, if necessary.

## C. The Court recommends that the Commissioner assign this case to a different ALJ on remand.

---

[22] For example, all of the State agency psychological consultants assessed Ms. Heckel as being "moderately limited" in her ability to, *inter alia*, (1) accept instructions and respond appropriately to supervisors, and (2) complete a normal workday and workweek. (AR 310-11, 526-27, 1371-73, 1388-90.) However, each offered a different explanation of his or her summary conclusions, though Dr. Gucker's explanation is the only one the ALJ discussed. (AR 312, 527, 1236, 1373, 1390.)

Finally, the Court must consider Ms. Heckel's request that the Court remand this matter for rehearing before a different ALJ. (Doc. 23 at 25.) In an unpublished decision, the Tenth Circuit stated that it will direct assignment of a social security case to a different ALJ on remand "only in the most unusual and exceptional circumstances." *Miranda v. Barnhart*, 205 F. App'x 638, 644 (10th Cir. 2005) (quotation marks omitted). Moreover, the Seventh Circuit has stated that courts "have no general power . . . to order that a case decided by an administrative agency be sent back . . . to a different [ALJ]" in the absence of sufficient evidence of bias to require review by a different ALJ as a matter of due process. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). Nevertheless, a number of courts have either directed or recommended reassignment of social security cases on remand for various reasons other than bias, including that the ALJ "mischaracterized the record," "failed to consider the record with adequate care," or "failed to adequately consider the medical evidence." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004) (collecting cases); *see also Guthrie v. Barnhart*, No. CV 03-1399 KBM, 2004 WL 7337620, at *5 (D.N.M. Aug. 12, 2004) (recommending "that the Commissioner consider assigning this matter to a different ALJ upon remand to take a fresh look at the matter").

Here, Ms. Heckel has not alleged, and the Court does not find, sufficient evidence of bias to require review by a different ALJ as a matter of due process. However, as discussed herein, the Court finds that the ALJ's March 2018 decision failed to consider and discuss the medical evidence with adequate care, notwithstanding this Court's two prior reversals for similar reasons. Consequently, and in light of the many years during which Ms. Heckel's social security claims have now been pending, the Court concludes that, "rather than have the same ALJ review the claims a third time, a fresh look by another ALJ would be beneficial." *Sutherland*, 322 F. Supp.

2d at 292. Thus, the Court recommends that the Commissioner assign this case to a different ALJ on remand, though the Court does not require the Commissioner to do so.

### IV.  <u>Conclusion</u>

For the reasons stated above, IT IS HEREBY ORDERED that Ms. Heckel's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 23) is GRANTED.

IT IS FURTHER RECOMMENDED that the Commissioner assign this case to a different ALJ on remand.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent